UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WINIFRED ROGER PHILLIPS,

        Petitioner,

                                        Case Number 11-13386

v.                                    Honorable Sean F. Cox

MARY BERGHUIS,

        Respondent.

_____/

**OPINION AND ORDER
DENYING THE HABEAS CORPUS PETITION** (Doc. #1),
**GRANTING  A CERTIFICATE OF APPEALABILITY, AND
GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS***

     Petitioner Winifred Roger Phillips has filed a *pro se* habeas corpus petition under 28 U.S.C. § 2254.[1]  The habeas petition challenges Petitioner's convictions for  first-degree murder, armed robbery, felon in possession of a firearm, assault with intent to commit murder, conspiracy to commit armed robbery, and two counts of possession of a firearm during the commission of a felony (felony firearm).  Petitioner alleges that: (1) he was denied a fair trial by being tried with his co-defendant, Isaiah Mayweather, and defense counsel was ineffective for failing to move for severance; (2) his attorney operated under a conflict of interest; (3) the trial court abused its discretion by denying his motion for a mistrial, which was based on a prosecution witness's prejudicial remarks; and (4) trial counsel was ineffective for failing to move to suppress a suggestive identification.  Respondent argues in an answer to the habeas petition that habeas claim two and the

---

    [1] Petitioner's first name is spelled as "Winifred" and "Winfred" in the state court record. The Court has adopted the spelling used on the face of the habeas corpus petition and Petitioner's reply brief.

first part of claim one are procedurally defaulted and that habeas relief is not available even if the

procedural defaults are overlooked.  The Court agrees that two of the habeas claims are procedurally

defaulted and that habeas relief is not warranted because the state appellate court's rejection of

Petitioner's claims was not contrary to, or an unreasonable application of, Supreme Court precedent.

Accordingly, the petition is denied.  A procedural history and analysis of Petitioner's claims follows.

## I.  BACKGROUND

The charges against Petitioner arose from a robbery and several shootings at Buscemi's party

store in Eastpointe, Michigan on September 27, 2007.  Petitioner was tried jointly with co-defendant

Isaiah Mayweather in Macomb County Circuit Court.  The evidence at trial established that,

> [a]t approximately 10:30 p.m. Mayweather entered the store, purchased some cigar
> wrappers, and left.  At approximately 10:45 p.m., Phillips entered the store wearing
> a white t-shirt, jeans, and a red bandana.  Phillips walked to the back, where an
> employee, Mohammed Al-Harbi, was working.  Seconds later, Mayweather, wearing
> a black shirt and carrying a black backpack, re-entered the store, approached the
> manager, Sinan Hanna, at the counter, and asked for a bottle of vodka.  Hanna
> requested Mayweather's identification and Mayweather refused.  At the same time,
> Hanna heard gunshots from the back of the store.  Hanna observed Phillips, armed
> with a gun, chasing Al-Harbi from the store's kitchen toward the office, and heard
> additional gunshots.  Al-Harbi eventually died after having been shot 11 times.
>
> While Phillips chased Al-Harbi, Mayweather pointed a gun at Hanna, moved
> behind the counter with the gun and stood two or three feet from Hanna.  After
> Hanna opened the cash register and lottery drawers, he put his hands up and
> Mayweather took the contents of both drawers.  Next, Mayweather demanded the
> store's security videotapes.  Security cameras recorded the incident, but Hanna told
> Mayweather that the store was not equipped with them.  Following this rebuff,
> Mayweather cursed at Hanna and shot Hanna in the head.  Hanna survived his
> suffered injuries, requiring surgery and hospitalization for several days.
>
> Following the robbery, the police released footage from the security cameras
> to the media.  Consequently, the police received several tips identifying defendants
> as the perpetrators.  One informant who immediately identified both defendants was
> Patricia Pitts.  Pitts was formerly Phillips's foster mother, and had other children
> who are friends with Mayweather.  Hanna also participated in a photographic lineup
> while he was recovering in the hospital.  While he was unable to positively identify

2

the person who shot him, he narrowed his choice to two photographs including Mayweather and another individual.

On the day after the robbery, Mayweather drove his wife's Intrepid to visit his sister, Barbara Hamilton. On direct examination by the prosecution, Hamilton denied that she and Mayweather discussed the incident at the store or watched the footage. She also denied that Mayweather requested she care for his children because he planned to leave town. Following Hamilton's testimony, the prosecution called Daniel Nash, Mayweather's parole agent, and Lieutenant Leo Borowsky, who each testified, over the objection by Mayweather, that she had discussed his involvement in the incident with Mayweather and that he requested she care for his children because he was leaving town. Mayweather did, in fact, leave Michigan, and he was arrested by police, after being located through the use of global positioning data, in a Chicago train station. At the time of his arrest, Mayweather initially provided a fictitious name to an officer, but then provided his given name and stated, "I'm the one you are looking for. . . ." The police recovered $343 in small denominations from him and recovered a dozen $5 bills and five $20 bills from his home. The police also searched Mayweather's wife's Intrepid and recovered a $71 receipt for the delivery of 7-Up [to] the party store by a 7-Up distributor on September 27 at 11:31 a.m., 11 hours prior to the robbery. The storeowner testified that this receipt would have been in the cash register at the time of the robbery.

Several days after the robbery, the police also arrested Phillips in a Grand Rapids home. In the basement of that home, the police recovered a red bandana and jeans similar to those worn by Al-Harbi's shooter.

*People v. Phillips*, No. 288414, 2010 WL 364198, at *1-*2 (Mich. Ct. App. Feb. 2, 2010) (unpublished).

Neither Petitioner, nor Isaiah Mayweather testified or presented any witnesses. Petitioner's defense was that he was innocent of all the charges and that Sinan Hanna was mistaken in his identification of Petitioner as the man who shot Mr. Al-Harbi.

On August 22, 2008, the jury found Petitioner guilty, as charged, of: first-degree (felony) murder, Mich. Comp. Laws § 750.316(1)(b); armed robbery, Mich. Comp. Laws § 750.529; felon in possession of a firearm, Mich. Comp. Laws § 750.224f; assault with intent to commit murder, Mich. Comp. Laws § 750.83; conspiracy to commit armed robbery, Mich. Comp. Laws § 750.529;

3

Mich. Comp. Laws § 750.157a; and two counts of felony firearm, Mich. Comp. Laws § 750.227b. The trial court sentenced Petitioner as follows: life imprisonment for the murder; twenty-three to sixty-five years in prison for the armed robbery, assault, and conspiracy; one to five years in prison for being a felon-in-possession of a firearm; and two years in prison for the felony-firearm convictions.[2] The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished, *per curiam* opinion, *see People v. Phillips*, No. 288414, 2010 WL 364198 (Mich. Ct. App. Feb. 2, 2010),[3] and on September 27, 2010, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Phillips*, 488 Mich. 869; 788 N.W.2d 423 (2010) (table). On August 4, 2011, Petitioner filed his habeas corpus petition.

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, the court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[2] The sentence for the first felony firearm conviction was ordered to run consecutively to the sentence for the armed robbery conviction, but concurrently to all other counts. The sentence for the other felony firearm conviction was ordered to run consecutively to the sentence for the assault conviction, but concurrently to all other counts.

[3] Petitioner's appeal of right was consolidated with Isaiah Mayweather's appeal. State appellate judge Elizabeth L. Gleicher concurred in the results reached by the two-judge majority, but expressed her disagreement on an issue raised only by Isaiah Mayweather: whether the trial court properly admitted testimony impeaching prosecution witness Barbara Hamilton.

 (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

> This distinction creates "a substantially higher threshold" for obtaining relief than *de novo* review. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)."

*Renico v. Lett*, 559  U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

# III. DISCUSSION

## A.  The Joint Trial

Petitioner alleges that he was denied a fair trial because he was tried with Isaiah Mayweather. There was only one jury, and Petitioner contends that, because of prejudicial testimony about Mayweather, the result of the trial would have been different if he had been tried separately. Petitioner also alleges that his trial attorney was ineffective for failing to request a separate trial.

Respondent argues that Petitioner's challenge to his joint trial is procedurally defaulted.  A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997).  The doctrine of procedural default prohibits a federal court from reviewing the merits of a habeas petitioner's claims, including constitutional claims, if a state court declined to hear the claims because the prisoner failed to abide by a state procedural rule.  *Martinez v. Ryan*, __ U.S. __, __, 132 S. Ct. 1309, 1316 (2012).

On habeas review, a prisoner may obtain relief on a procedurally defaulted claim only if he or she "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  In this Circuit,

> "[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met:  (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default."  [*Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir. 2011), *cert. denied*, __ U.S. __, 133 S. Ct. 107 (2012)].  To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim." *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (*en banc*).

*Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013).

6

**1. The First Three Factors of Procedural Default**

In Michigan, defendants in criminal cases are required to preserve their claims for appeal by first making an objection in the trial court. *People v. Carines*, 460 Mich. 750, 761-64; 597 N.W.2d 130, 137-39 (1999). Petitioner violated this procedural rule by not moving to sever his case from co-defendant Isaiah Mayweather's case. Thus, the first element of procedural default is satisfied.

The second element of procedural default is enforcement of a state procedural rule. The Michigan Court of Appeals was the only state court to review Petitioner's claim in a reasoned opinion. It reviewed Petitioner's claim for "plain error affecting his substantial rights" and concluded that it was not plain error to jointly try the defendants. A state appellate court's review for "plain error" constitutes enforcement of a state procedural rule. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). Therefore, the second element of procedural default is satisfied.

The third element of procedural default requires determining whether the state procedural rule was an adequate and independent state ground for denying review of a federal constitutional claim. "The adequacy of a state procedural bar turns on whether it is firmly established and regularly followed; a state rule is independent if the state court actually relies on it to preclude a merits review." *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005) (citing *Abela v. Martin*, 380 F.3d 915, 921 (6th Cir. 2004)).

"[T]he procedural rule requiring objection below to preserve an issue on appeal is both firmly established and regularly followed by Michigan state courts." *Morgan v. Lafler*, 452 F. App'x 637, 647 (6th Cir. 2011). And the Michigan Court of Appeals actually relied on the rule by reviewing Petitioner's claim for "plain error." Thus, the rule requiring defendants to object in the

trial court before raising their claims on appeal is an adequate and independent state ground for denying review of Petitioner's claim.

To summarize, the first three elements of procedural default are satisfied. Petitioner violated a relevant state procedural rule, the last state court to review his claim in a reasoned opinion enforced the rule, and the rule is an adequate and independent state ground for precluding review of Petitioner's federal claim. Federal habeas review of Petitioner's claim is barred unless he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider [his] claim[] will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750.

### 2. "Cause"

Petitioner attempts to show "cause" for his procedural default by alleging that his trial attorney was ineffective for failing to move for severance.

### a. Legal Framework

"Ineffective assistance of counsel can constitute cause for a procedural default," *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013), but "[a]ttorney error short of ineffective assistance of counsel does not constitute cause for a procedural default . . . ." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). An attorney is constitutionally ineffective only if the attorney's "performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. The prejudice prong "requires showing that counsel's errors were so serious as

8

to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

To determine whether Petitioner's trial attorney was ineffective for failing to seek a separate trial, the Court must examine the law on severance. Severance is governed by state law, *Hutchinson v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002), and, in Michigan, "[t]he decision to sever or join defendants lies within the discretion of the trial court." *People v. Hana*, 447 Mich. 325, 331; 524 N.W.2d 682, 684 (1994). Severance is required when "necessary to avoid prejudice to substantial rights of the defendant." Mich. Ct. R. 6.121(C). A defendant must demonstrate "that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *People v. Hana*, 447 Mich. at 331; 524 N.W.2d at 684. " 'Incidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice,' " *id.*, 447 Mich. at 349; 524 N.W.2d at 692 (quoting *United States v. Yefsky*, 994 F.2d 885, 896 (1st Cir. 1993)), and the risk of prejudice may be allayed by proper instructions. *Id.*, 447 Mich. at 351, 524 N.W.2d at 692-93.

**b. Application**

This case involved a single incident, which resulted in identical charges being brought against both Petitioner and Isaiah Mayweather. The trial was relatively long (eight days), and there were multiple witnesses. The prosecutor proceeded on a theory that the defendants aided and abetted each other and conspired to commit the robbery. The defendants did not have antagonistic defenses, and even though neither defendant testified or presented any witnesses, Petitioner was not precluded from presenting exculpatory evidence.

Petitioner nonetheless contends that the "spillover effect" of being tried with Isaiah Mayweather was overwhelming. Petitioner asserts that, if he had been tried separately, the jury would not have heard testimony from the following witnesses: Barbara Hamilton (Mayweather's

9

sister) who testified that she learned about the shooting from Mayweather's parole officer (Trial Tr. Vol. IV, 127-33, Aug. 15, 2008); the parole officer (Daniel Nash) who testified that Ms. Hamilton informed him that Mayweather had called her and apologized to the family for the incident (*id*. at 134-39); Lieutenant Leo Borowski who testified that Ms. Hamilton informed him that Mayweather had admitted his involvement in the crimes (*id*. at 149-79); and George Hawkins (Mayweather's father-in-law) who testified that the Intrepid in which the police found a receipt for the delivery of 7-Up to Buscemi's party store on September 27, 2007, belonged to Mayweather's wife (*id*. at 142-47).  Although all of this testimony was damaging evidence, the Michigan Court of Appeals implied that the evidence would have been relevant and competent evidence even if Petitioner were tried separately.  *See People v. Phillips*, 2010 WL 364198, at *2 (stating that Petitioner failed "to argue why evidence from witnesses regarding Hamilton's statements and the recovery of the Intrepid would not have been relevant and competent evidence in his separate trial").  The state court's interpretation of state law binds this court  on habeas corpus review. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Furthermore, Petitioner's foster mother testified that Petitioner and Mayweather were not close friends and did not "hang out together."  (Trial Tr. Vol. V, 8, Aug. 19, 2008.)  And the trial court gave the following jury instruction:

> The fact that [the defendants] are on trial together is not evidence that they were associated with each other or that either one is guilty.  You should consider each defendant separately.  Each is entitled to have this case decided on the evidence and the law that applies to him.
>
> If any evidence was entered as to one defendant, you should not consider it as to any other defendant.
>
> . . . .

. . . . You must return a separate verdict for each defendant. . . . Remember, you must consider each defendant separately.

(Trial Tr. Vol. VIII, 109-10, Aug. 22, 2008.)

The trial court subsequently reiterated that the jurors should consider each defendant separately (*id*. at 121), that each defendant was entitled to have his case decided on the evidence and the law that applied to him (*id*. at 121-22), and that each defendant was entitled to have his guilt or innocence decided individually (*id*. at 128). "Juries are presumed to be capable of following instructions . . . regarding the sorting of evidence and the separate consideration of multiple defendants." *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) (citing *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993)).

In light of the trial court's jury instructions, the defendants' common defense of mistaken identification, and the likelihood that the disputed testimony would have been admissible in a separate trial, defense counsel's failure to seek a separate trial did not amount to deficient performance. Even if counsel's performance was deficient, the deficient performance did not prejudice the defense, because there was substantial evidence against Petitioner, apart from the incriminating evidence against Mayweather. Petitioner was visible in images made from the surveillance tape, and his foster mother recognized him in the videotape that was released to the media. Additionally, Mr. Hanna identified Petitioner as the man who shot Mr. Al-Harbi, and a red "doo rag" or bandana similar to the one seen on the suspect in the surveillance tape was found in the house where Petitioner was arrested.

Defense counsel's performance was not deficient, and the allegedly deficient performance did not prejudice the defense. Therefore, Petitioner's claim about trial counsel fails on the merits and fails to establish "cause" for Petitioner's procedural default.

11

### 3.  Prejudice; Miscarriage of Justice

The Court need not consider whether Petitioner has established prejudice from the alleged violation of constitutional rights, because he has not shown "cause."  *Tolliver v. Sheets*, 594 F.3d 900, 930 n.13 (6th Cir. 2010).  In the absence of "cause and prejudice," Petitioner can prevail on his procedurally defaulted claim only if he "demonstrate[s] that the failure to consider [his claim] will result in a fundamental miscarriage of justice.  A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'"  *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. at 496).  To be credible, however, "such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  "A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence . . . any reasonable juror would have reasonable doubt."  *House v. Bell*, 547 U.S. 518, 538 (2006).

Petitioner has not produced any new evidence of actual innocence, and the evidence against him, as summarized above, was substantial.  Therefore, a miscarriage of justice will not occur as a result of the Court's failure to address Petitioner's first claim on the merits.  His claim is procedurally defaulted and does not require an adjudication on the merits.


### B.  Alleged Conflict of Interest

Petitioner alleges next that his trial attorney, Timothy Barkovic, operated under a conflict of interest because Barkovic previously represented David Maki who was a prosecution witness at Petitioner's trial.  Petitioner contends that Mr. Barkovic had competing interests and that his conduct

12

was unethical, immoral, and prejudicial.

### 1. Procedural Default

Respondent argues that Petitioner's second claim, like the first part of Petitioner's first claim, is procedurally defaulted. In Michigan, if a party expressly approves of a proceeding in the trial court, a waiver occurs; the waiver extinguishes any error and precludes appellate review of the issue. *People v. Carter*, 462 Mich. 206, 215-16, 219-20; 612 N.W.2d 144, 149, 151 (2002). Petitioner violated this rule by waiving his right to contest his attorney's representation of him at trial,[4] but arguing on appeal that his attorney operated under a conflict of interest.

The Michigan Court of Appeals enforced the waiver rule when it stated on direct review that Petitioner was precluded from raising his claim on appeal because he consented to his attorney's continued representation after the attorney disclosed that he previously represented David Maki and that there was a potential conflict of interest. The waiver rule is an independent and adequate state ground for denying relief because it was firmly established and regularly followed before Petitioner's trial. Therefore, Petitioner's second claim is procedurally defaulted unless he shows "cause" for his default and resulting prejudice or a miscarriage of justice.

Petitioner has not alleged "cause" for his default. Nor can he, because, after acknowledging the potential conflict of interest, he intentionally relinquished and abandoned his right to object to his attorney's representation of him. *Cf. Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (explaining

---

[4] When Petitioner's attorney, Timothy Barkovic, questioned Petitioner about the potential conflict of interest, Petitioner acknowledged that Barkovic had explained to him what a conflict of interest was. Petitioner also acknowledged the fact that Barkovic had previously represented David Maki and that Maki was planning to testify against him. And, despite having read Maki's statement and having heard Maki's hostile remarks about Barkovic, Petitioner said that he had no problem with defense counsel representing him. He then agreed to having defense counsel continue his representation. (Trial Tr. Vol. VI, 13-15, Aug. 20, 2008.)

that a waiver ordinarily is "an intentional relinquishment or abandonment of a known right or privilege"). And because a miscarriage of justice will not occur if the Court declines to address Petitioner's claim on the merits, the claim is procedurally defaulted.

## 2. On the Merits

For the reasons given below, Petitioner's claim lacks merit even if it were not procedurally defaulted.

### a. Clearly Established Federal Law

To prevail on a claim of ineffective assistance of counsel, a petitioner ordinarily has to show that the attorney's performance was deficient *and* that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. at 687. When counsel operates under an actual conflict of interest, prejudice is presumed. *Id.* at 692. But, to establish a Sixth Amendment violation, a defendant who raised no objection to his attorney's continued representation at trial must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

> In *Stewart v. Wolfenbarger*, 468 F.3d 338, 350 (6th Cir. 2006), [the Sixth Circuit] noted that the Supreme Court has thus far applied the *Sullivan* prejudice presumption only in the case of a conflict of interest arising from multiple concurrent representation of defendants, and has left open the question whether the presumption could apply in the case of a conflict arising from *successive* representation. *Id.* (citing *Mickens v. Taylor*, 535 U.S. 162, 175–76, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)). Multiple concurrent representation, also referred to as joint or dual representation, occurs where a single attorney simultaneously represents two or more codefendants in the same or separate proceeding(s), whereas successive representation occurs where defense counsel has previously represented a co-defendant or trial witness. *Moss v. United States*, 323 F.3d 445, 455, 459 (6th Cir. 2003).

*Jalowiec v. Bradshaw*, 657 F.3d 293, 314-15 (6th Cir. 2011) (emphasis in original), *cert. denied*, __ U.S. __, 133 S. Ct. 107 (2012).

14

### b.  The Relevant Facts

David Maki was an endorsed prosecution witness who was scheduled to testify on the sixth day of Petitioner's trial.  Before Maki testified, Mr. Barkovic raised the issue of a potential conflict of interest.  In the jury's absence, Barkovic stated that he had previously represented Maki on criminal charges.  Maki then confirmed that Barkovic had represented him on criminal charges twenty years earlier in a home invasion case for which he was sentenced to three and a half to fifteen years in prison.  Maki stated that his only contacts with Mr. Barkovic since then consisted of seeing Barkovic a few times at the jail where Maki was a porter.  Maki thought that the last time he had seen Barkovic was in the 1990's.[5]  On that occasion, Maki had asked Barkovic about filing a motion, and Barkovic had assured him that he had the ability to file the motion himself.  Although Maki expressed considerable hostility and resentment toward Barkovic during this exchange, he admitted that Barkovic's prior representation of him had nothing to do with Petitioner's case.  Maki also stated that his feelings toward Barkovic would not affect his testimony in Petitioner's case.  (Trial Tr. Vol. VI, 4-12, Aug. 20, 2008.)

Mr. Barkovic then questioned Petitioner about the potential conflict of interest.  Petitioner expressly agreed to have Barkovic continue to represent him.  (*Id*. at 13-15.)  Barkovic nevertheless moved to withdraw from the case due to his concern that Maki's animosity toward him would influence Maki's testimony and adversely affect Petitioner.  The trial court denied the motion, noting that both Maki and Petitioner had waived the right to contest any potential conflict of interest.  (*Id*. at 15-18.)  The prosecutor then established that Maki had not received any consideration for his testimony in Petitioner's case (*id*. at 20-25), and the trial resumed in the jury's presence with Maki

---

[5]  Petitioner's trial occurred in August of 2008.

testifying about Petitioner's admissions to him while the two of them were in jail together.

### c. Analysis

It is clear from the record, as summarized in the preceding paragraphs, that this is not a case of multiple concurrent representation. Timothy Barkovic's representation of David Maki in the home invasion case occurred twenty years before he represented Petitioner in an unrelated case. Barkovic's representation of Petitioner and David Maki was successive, not concurrent, intertwining, or overlapping.  Consequently, *Cuyler v. Sullivan* does not apply, and because Petitioner cites no other Supreme Court decision in support of his claim, he has no right to habeas relief on his conflict-of-interest claim.

Even if *Cuyler v. Sullivan* were applicable here, Petitioner has failed to show that his attorney operated under an actual conflict of interest and that the alleged conflict adversely affected his attorney's performance.  Mr. Barkovic's prior representation of David Maki was completely unrelated to Petitioner's case, and there is no indication in the record that Barkovic's trial strategy was influenced by Maki's interests.  In fact, Barkovic attempted to  to show that Maki's incriminating testimony about Petitioner was not reliable or credible.

Furthermore, the trial court ultimately struck Maki's entire testimony after Maki made derogatory statements about Barkovic and became "totally uncontrollable."  (Trial Tr. Vol. VI, 36, August 20, 2008.)  The trial court also instructed the jury to disregard everything Maki had said. (*Id*. at 38.)

The Michigan Court of Appeals reasonably concluded that Petitioner had failed to show an actual conflict of interest adversely affected his attorney's performance.  This Court therefore declines to grant relief on Petitioner's second claim.

16

### C.  Denial of the Motion for a Mistrial

Petitioner alleges next that the trial court abused its discretion and deprived him of  a fair trial by denying his motion for a mistrial after David Maki made prejudicial remarks about him and his attorney.  According to Petitioner, Maki's remarks impermissibly prejudiced the atmosphere, made it impossible for the jury to render an impartial verdict on only the admissible evidence, and may have prompted the jury to convict him.  The Michigan Court of Appeals disagreed with Petitioner's assertions and concluded that the trial court did not abuse its discretion when it denied Petitioner's motion.

#### 1.  Clearly Established Federal Law

"The decision to declare a mistrial is left to the 'sound discretion' of the judge . . . ." *Renico v. Lett*, 559 U.S. at 774.  But the question on habeas corpus review is not whether the trial court abused its discretion, was right or wrong, or should have declared a mistrial.  *Id*. at 772-73, 778 n.3. "The question under AEDPA is instead whether the determination of the [state appellate court] that there was no abuse of discretion was 'an unreasonable application of . . . clearly established Federal law.'  § 2254(d)(1)."  *Id*. at 773.

#### 2.  The Underlying Facts

Petitioner's motion for a mistrial arose from David Maki's unflattering remarks during his trial testimony.  He testified on direct examination by the prosecutor that he knew Petitioner from "slinging dope" in Detroit and that, while he and Petitioner were in jail together, Petitioner admitted his involvement in the shooting on Gratiot Avenue.  According to Maki, Petitioner admitted that he had chased the victim and fired at him several times.  Petitioner also told Maki that he was wearing a "doo rag" at the time and that he was worried about being identified by the cashier in the store and

by his own foster mother, who identified him as a possible suspect. (Trial Tr. Vol. VI, 27-33, Aug. 20, 2008.)

On cross-examination of Mr. Maki, Mr. Barkovic asked Maki whether he was a "snitch." Mr. Maki admitted that he was a "snitch" or a "rat," but he claimed that he was testifying against Petitioner to repay society for his crimes. He then made disparaging remarks about Mr. Barkovic, calling him a "coke head" and insinuating that Barkovic had been involved with illicit drugs and arrested for drunk driving. (*Id*. at 33-36.) At that point in the proceedings, the trial court excused the jury and indicated to the parties that it was planning to excuse Mr. Maki as a witness because Maki was "being totally uncontrollable." (*Id*. at 36.)

When the jurors re-entered the courtroom, the court explained to them that it had made a determination on its own motion that, because Mr. Maki was "so uncontrollable" and " so unresponsive to the questions posed by counsel, that it negate[d] any sort of value to this trial." *Id*. at 38. The court instructed the jurors to disregard all of Maki's testimony and not to consider any notes they took of his testimony.

After the court excused the jury for the lunch break, Mr. Barkovic moved for a mistrial on the basis of Mr. Maki's "scandalous, slanderous and completely untrue assertions." (*Id*. at 39.) Barkovic claimed that he had no way of refuting Maki's testimony in front of the jury and that the court should grant a mistrial on the basis of prosecutorial misconduct, not manifest necessity. Mr. Barkovic claimed that the prosecution had called Mr. Maki as a witness, despite knowing about Maki's animosity toward him and despite the fact that Maki was not needed to prove the prosecution's case. The trial court denied the motion for a mistrial without prejudice because, in its opinion, the prosecutor was as surprised as everyone else in the room when Maki made his outburst.

18

The trial court did not think Mr. Barkovic would have produced Mr. Maki as a witness if he had known Maki's outburst and unresponsiveness were likely to occur.  (*Id.* at 39-50.)

### 3. Analysis

A prosecutor's conduct rises to the level of a constitutional violation only if it infects the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  And in Michigan, unresponsive testimony by a prosecution witness, generally "does not justify a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony." *People v. Hackney*, 183 Mich. App. 516, 531; 455 N.W.2d 358, 365 (1990).  Further, "[w]hen a motion for a mistrial is premised on the unsolicited outburst of a witness, it should be granted only where the comment is so egregious that the prejudicial effect cannot be cured." *People v. Bauder*,  269 Mich. App. 174, 195; 712 N.W.2d 506, 519 (2005), *abrogated in part on other grounds by Giles v. California*, 554 U.S. 353, 367-68 (2008).

It was evident before David Maki testified that he harbored considerable animosity toward Mr. Barkovic, for he made the following remarks in the jury's absence when Barkovic asked him whether he had a problem with Barkovic's prior representation of him:

> You sold me out, Tim.  You made me cop to a 3 and [a] half to 15, to something.  I was retrieving my own property.  Other than that, you did your job, but you gave it about as much effort as the closing of the door.
>
> I don't have no problem with you.  That has been a part of my past.  It is 20 years ago almost.  You, you done, you got down.
>
> . . .
>
> You traded my case for something else, made me plea.  That was a defense.  I almost had it.  Then you just flipped when we got up to circuit court, flat out.
> . . .

19

I wanted to forget you as fast a[s] possible.

. . .

You are just another chair.

(Trial Tr. Vol. VI, 8-9, Aug. 20, 2008.)

Despite the obvious animosity Mr. Maki felt toward Mr. Barkovic, there is no indication in the record that the prosecutor conspired with Mr. Maki or encouraged Maki to make prejudicial remarks during his subsequent testimony before the jury. Nor is there any indication that the prosecutor knew Mr. Maki would give unresponsive testimony on cross-examination by Mr. Barkovic. In fact, the prosecutor stated in his response to Mr. Barkovic's motion for a mistrial that he did not expect or anticipate Mr. Maki's reaction during Barkovic's cross-examination of Maki. (*Id*. at 44.)

The prosecutor also maintained that Mr. Maki was an essential witness. He explained that the decision to call Maki was based on a two-page document in which Maki indicated that Petitioner confessed to the crime and provided other details about the crime, all of which were entirely reliable. (*Id*. at 43-44.) The prosecutor claimed that he first leaned about Mr. Barkovic's prior representation of Mr. Maki that morning when he and Mr. Barkovic went to speak with Maki. Maki had indicated to them at the time that he was proceeding on his own volition because he thought Petitioner should answer for his crimes. "It had nothing to do with defense counsel," according to the prosecutor. (*Id*. at 44.) The prosecutor also pointed out that he had called Mr. Maki on the basis of Maki's substantial and credible information and that it was not until Mr. Barkovic antagonized Maki by calling him a "rat" and a "snitch" that Maki responded in the way he did. (*Id*. at 43-45.) The trial court denied the motion for a mistrial on grounds that the prosecution was as surprised as everyone

20

else in the courtroom when Maki accused Mr. Barkovic of illegal activity and the jury appeared to be relieved when the court excused Maki as a witness. (*Id*. at 49-50.)

The record, as summarized above, indicates that the prosecutor's conduct was not improper. Furthermore, the trial court's instruction to the jury to disregard David Maki's testimony cured any prejudicial effect Maki's unsolicited outburst may have had on the jury. Consequently, the state trial court's denial of the motion for a mistrial was justified, and the state appellate court's decision upholding the trial court's ruling was not objectively unreasonable. Given the deference due to the state courts' rulings, Petitioner has no right to relief on the basis of the denial of his motion for a mistrial.

**D. Trial Counsel**

The fourth and final habeas claim alleges that Petitioner's trial attorney was ineffective for failing to move to suppress Sinan Hanna's identification of Petitioner at trial. Petitioner claims that Mr. Hanna identified the perpetrator in a police report as a white or light-skinned male. Petitioner alleges that he is a dark-skinned black male and that Mr. Hanna's identification of him at the preliminary examination was fatally tainted by the suggestive nature of the one-on-one confrontation. Petitioner further alleges that Mr. Hanna's in-court identification of him lacked an independent basis.

The Michigan Court of Appeals disagreed with Petitioner and stated that, even if the pretrial identification procedure were impermissibly suggestive, there was an independent basis for Mr. Hanna's in-court identification of Petitioner. The Court of Appeals concluded that a motion to suppress the in-court identification would have lacked merit and that Petitioner's attorney was not ineffective for failing to make a meritless motion. The Court of Appeals also stated that, in light of

21

the other evidence linking Petitioner to the crime, there was not a reasonable probability that the outcome would have been different had his attorney moved to suppress the in-court identification.

### 1. Deficient Performance

An attorney is constitutionally ineffective if the attorney's "performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. at 687. The "deficient performance" prong of this two-part test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

Petitioner asserts that Mr. Barkovic's performance was deficient because Barkovic failed to file a motion to suppress Mr. Hanna's in-court identification of him. However, the failure to file a motion challenging the identification appears to have been a strategic decision. Rather than filing the motion, Mr. Barkovic thoroughly cross-examined Mr. Hanna at trial about his identification of Petitioner (Trial Tr. Vol. IV, 22-53, Aug. 15, 2008) and argued to the jury that the case was one of mistaken identification (Trial Tr. Vol. VIII, 47-48, Aug. 22, 2008).

Given the obvious trial strategy, the failure to file a motion to suppress the identification is not a basis for a claim of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. at 689 (stating that, "[j]udicial scrutiny of counsel's performance must be highly deferential" and, because of the difficulties inherent in evaluating counsel's conduct from counsel's perspective at the time, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy,' ") (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "There are countless ways to provide

effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id*. It is not ineffective assistance to challenge a witness's identification of a suspect at trial, rather than in a preliminary motion. *Sanders v. Curtin*, 529 F. App'x 506, 520 (6th Cir. 2013). In fact, "[c]ases reach the opposite conclusion." *Id*. (citing *Brown v. Lafler*, No. 09-10852, 2010 WL 5148498, at *9 (E.D. Mich. Dec. 14, 2010)). Accordingly, Petitioner has failed to satisfy the deficient-performance prong of *Strickland*.

### 2. Prejudice

The second prong of the *Strickland* test requires asking whether the attorney's conduct prejudiced the defense. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. at 687.

For the following reasons, the Court finds that Petitioner "cannot establish prejudice under *Strickland*, because he cannot show that a motion to exclude [Mr. Hanna's] identification[] would have succeeded." *Howard v. Bouchard*, 405 F.3d 459, 481 (6th Cir. 2005).

### a. Suggestiveness

To establish that a motion to exclude Mr. Hanna's identification would have succeeded, Petitioner must first show that the pretrial identification procedure was " 'so unnecessarily suggestive and conductive to irreparable mistaken identification that he was denied due process of law.' " *Neil v. Biggers*. 409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)).

The first and only pretrial opportunity Mr. Hanna had to make an identification of Petitioner was at Petitioner's preliminary examination. Petitioner was the only black man  wearing a blue

23

outfit, he was handcuffed, and he was seated where defendants usually sit. (Prelim. Examination Tr., 107, Feb. 29, 2008.) Although Mr. Hanna claimed that he was not identifying Petitioner on that basis, viewing a defendant at the defense table at a preliminary hearing can be suggestive, even if only minimally so. *Howard v. Bouchard*, 404 F.3d at 470. The Court therefore will assume for purposes of this case that the in-court identification of Petitioner at the preliminary examination was at least somewhat suggestive.

### b. Reliability

The next question is whether, "under the 'totality of the circumstances,' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. at 199.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200.

### i. Opportunity to View the Suspect

The first *Biggers* factor assesses the witness's opportunity to view the defendant at the initial observation. *Howard v. Bouchard*, 405 F.3d at 472. Mr. Hanna testified at trial that he was at the front of the store when Petitioner entered the store. Petitioner was about eight or nine feet away, and he saw the side of Petitioner's face as Petitioner walked to the back of the store. Then, from a distance of fifteen to twenty-two feet, he saw Petitioner chasing Mr. Al-Harbi. Although Mr. Hanna subsequently was shot in the head, he was conscious when Petitioner left the store. (Trial Tr. Vol. III, 19-20, 29-31, 66-69, 79, Aug. 14, 2008.) The Court concludes that Mr. Hanna had a good

24

opportunity to view the man who shot Mr. Al-Harbi.

### ii.  Degree of Attention

The second *Biggers* factor assesses the witness's attentiveness during the initial observation.

> To analyze the sufficiency of an eyewitness's degree of attention, [courts] generally examine the circumstances surrounding the witness's encounter. *United States v. Thomas*, 116 Fed. Appx. 727, 736 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1116, 125 S.Ct. 1104, 160 L.Ed.2d 1064 (2005) (remanding in light of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)). [Courts] find more reliability where a witness was able to view the assailant with a "heightened degree of attention, as compared with disinterested bystanders or casual observers." *United States v. Crozier*, 259 F.3d 503, 511 (6th Cir. 2001) (quotation omitted).   Generally, [courts] place greater trust in witness identifications made during the commission of a crime because the witness has a reason to pay attention to the perpetrator.  *See United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004) (finding heightened degree of attention where witness spoke with robber and studied his features while looking for an opportunity to escape); *Crozier*, 259 F.3d at 511 (finding heightened degree of attention where robber confronted witnesses with a gun).

*Howard v. Bouchard*, 405 F.3d at 473.

Mr. Hanna claimed that he saw Petitioner chasing Mr. Al-Harbi with his gun pointed at Al-Harbi. (Trial Tr. Vol. III, 29-31, 105, Aug. 14, 2008.)  His attention, no doubt, was heightened by the fact that both suspects were armed, and his heightened attention likely became greater when he heard gunshots.  *See Howard v. Bouchard*,  405 F.3d at 483 (finding that the witnesses' heightened attention became greater when the shooter began to fire his gun).  The Court concludes that Mr. Hanna was attentive during the initial observation of the shooter.

### iii.  Accuracy of Description

The third *Biggers* factor "examines the accuracy of the witness's prior description of the defendant."  *Id*. at 473.  Petitioner alleges that he is dark complected and that Mr. Hanna's description of him after the incident was not consistent with his complexion.  Hanna's initial

descriptions of the man who shot Mr. Al-Harbi was that he was a light-skinned man. (Trial Tr. Vol. IV, 206, Aug. 15, 2008; Trial Tr. Vol. VII, 5, Aug. 21, 2008.)   And at Isaiah Mayweather's preliminary examination on November 15, 2007, Mr. Hanna described the suspect who shot Mr. Al-Harbi as bigger and not black.  (Trial Tr. Vol. IV, 42-44, Aug. 15, 2008.)

Although the earlier descriptions make the in-court identifications somewhat less reliable, the Sixth Circuit has found identifications reliable even when there are discrepancies in an earlier description. *Howard v Bouchard*, 405 F.3d at 483-84 (citing, as an example, *United States v. Meyer*, 359 F.3d 820 (6th Cir. 2004)).  Moreover, Hanna testified at trial that he moved to the United States from Iraq several years before Petitioner's trial and that English was not his first language.  (Trial Tr. Vol. III, 9-10, Aug. 14, 2008.)  He claimed that he had not adequately explained himself at Mr. Mayweather's preliminary examination because his English language skills were not good.  (*Id*. at 43; Trial Tr. Vol. IV, 43, 48, Aug. 15, 2008.)  Thus, the  inaccurate prior descriptions of Petitioner are not fatal.

### iv.  Level of Certainty at the Pretrial Identification

The fourth *Biggers* "factor examines the level of certainty shown by the witness at the pretrial identification." *Howard v. Bouchard*, 405 F.3d at 473.   Mr. Hanna initially testified at Petitioner's preliminary examination that he was only 80% to 85% sure that Petitioner was the man who shot Al-Harbi.   However, when the prosecutor asked Mr. Hanna to get off the witness stand and view Petitioner's profile from a distance of about fifteen feet, similarly to how he had viewed Petitioner during the crime, Hanna stated that he was 99% sure of his identification.  (Prelim. Examination, 111, 113-16, Feb. 29, 2008; Trial Tr. Vol. III, 22-24, Aug. 14, 2008; Trial Tr. Vol. IV,

50-52, Aug. 15, 2008.)[6] Mr. Hanna's certainty satisfies the fourth *Biggers* factor and supports the reliability of his identification. His clean "record of reliability" further weighs in his favor, as he had not previously identified Mr. Al-Harbi's shooter in any previous showups, lineups, or photographic showings. *Howard v. Bouchard*, 405 F.3d at 473 (citing *Neil v. Biggers*, 409 U.S. at 201).

### v. Length of Time

The fifth and final *Biggers* factor "looks at the length of time between the initial observation and the identification." *Id*. The length of time between the initial observation at the crime scene on September 27, 2007, and Mr. Hanna's first identification of Petitioner at his preliminary examination was five months. This was a significant delay, but it is not dispositive. *See, e.g., United States v. Hill*, 967 F.2d 226, 233 (6th Cir. 1992) (finding that an in-court identification was admissible in evidence despite a five-year delay between the crime and the identification); *United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987) (stating that "[a] three to four-month delay between the crime and the identification does not render the identification inherently unreliable"); and *United States v. Peterson*, 411 F. App'x 857, 865 (6th Cir. 2011) (finding a delay of one year and eight months "substantial," but "not dispositive").

The Court concludes from the totality of the circumstances that there was an independent basis for Mr. Hanna's in-court identification of Petitioner. Hanna had a good opportunity to view the person who shot Mr. Al-Harbi; his attention was heightened by the tense situation and the shooting; and although his initial description of Petitioner was inaccurate, he was 99% sure of his

---

[6] At trial, he also was 99% sure of his identification (Trial Tr. Vol. III, 21, 97, Aug. 14, 2008.) He claimed that he was not mistaken about Petitioner. (*Id*. at 102.)

identification when he viewed Petitioner's profile.  Further, the length of time between the crime and the confrontation was not particularly lengthy.

The identification was reliable enough to overcome the minimal suggestiveness of the pretrial identification procedure and to be admissible.  Therefore, a motion to suppress the in-court identification would not have succeeded, and Petitioner was not prejudiced by his attorney's allegedly deficient performance.  His fourth claim does not warrant habeas corpus relief.

## IV.  CONCLUSION

The Michigan Court of Appeals decision was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. The Court of Appeals decision certainly was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 131 S. Ct. at 786-87.  Accordingly, the petition for writ of habeas corpus (Doc. #1) is DENIED.

## V.  CERTIFICATE OF APPEALABILITY

Petitioner may appeal the denial of his habeas petition only if a district or circuit judge issues a certificate of appealability.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).   Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:

28

The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . . When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. at 484.

Reasonable jurists could debate the Court's assessment of Petitioner's claims and its procedural ruling on Petitioner's first and second claims. Reasonable jurists also could conclude that the issues are adequate to deserve encouragement to proceed further. Accordingly, the Court grants a certificate of appealability on all four habeas claims. Petitioner may proceed *in forma pauperis* on appeal without further authorization, because he was granted leave to proceed *in forma pauperis* in this Court and an appeal could be taken in good faith. 24 Fed. R. Civ. P. 24(a)(3).

Dated: April 8, 2014                                      S/ Sean F. Cox
                                                          Sean F. Cox
                                                          U. S. District Judge

I hereby certify that on April 8, 2014, to foregoing document was served on counsel of record via

electronic means and upon Winifred Phillips via First Class mail at the address below:

Winifred Phillips
304357
GUS HARRISON CORRECTIONAL FACILITY
2727 E. BEECHER STREET
ADRIAN, MI 49221

S/ Jennifer McCoy

Case Manager